Filed 2/7/14  P. v. Barbarin CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055565 |
| v. | (Super.Ct.No. RIF145530) |
| RICARDO ESTRADA BARBARIN, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Michele D. Levine, Judge.  Affirmed in part and reversed in part with directions.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Annie Fraser and Ronald A. Jakob, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I. INTRODUCTION

A jury found defendant Ricardo Estrada Barbarin guilty as charged of the first degree murder of 13-year-old Anthony Sweat while actively participating in a criminal street gang (Pen. Code, §§ 189, 190.2, subd. (a)(22)) and the premeditated attempted murders of four additional victims, Taren Anderson, Elliot Woods, Christopher S., and Tywan (Pen. Code, §§ 664, 187, subd. (a)).  The crimes occurred during a July 14, 2002, shooting in the City of Riverside.

The jury found defendant committed each crime for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)) and personally discharged a firearm in each crime (Pen. Code, § 12022.53, subd. (c)).  Defendant admitted one prior strike/prior serious felony conviction and one prison prior.  (Pen. Code, §§ 667, subds (a)-(i), 667.5, subd. (b).)  He was sentenced to life without the possibility of parole for the murder, plus 120 years to life for the gang-related attempted murders, plus 106 years based on the personal discharge and prior serious felony/prison prior enhancements.[1]

Defendant raises several claims of error:  (1) insufficient evidence supports his murder and attempted murder convictions because the only evidence connecting him to the shooting was DNA evidence on discarded clothing in an alleyway behind the scene of the shooting; (2) the trial court (a) erroneously excluded third party culpability evidence,

---

[1] The jury also found, in each count, that defendant was a principal and at least one principal personally and intentionally discharged a firearm proximately causing great bodily injury or death to another person not an accomplice (Pen. Code, § 12022.53, subds. (d), (e)), but sentence on these enhancements was stayed (Pen. Code, § 654).

2

(b) erroneously admitted weak DNA profile evidence taken from a ski cap, and (c) erroneously failed to instruct sua sponte to view his oral statements with caution; (3) the trial court further erred in failing to conduct an evidentiary hearing—after the trial concluded and the jury was discharged—to investigate the possibility of juror misconduct; (4) resentencing is required because the record affirmatively shows the trial court believed it had no discretion to impose concurrent terms on the attempted murder convictions, and accordingly imposed consecutive terms; and finally (5) the abstract of judgment must be amended to strike a $10,000 parole revocation fine that was never imposed and to identify the proper payee of an $11,065 victim restitution order.

We agree the matter must be remanded for resentencing so the trial court may exercise its discretion to impose concurrent rather than consecutive terms on counts 2 through 5, in accordance with the "Three Strikes" law. (Pen. Code, § 667, subd. (c)(6), (7) [concurrent terms may be imposed on current felonies committed on same occasion or arising from same set of operative facts].) We also agree the abstract of judgment must be amended as claimed. We reject defendant's other claims of error and affirm the judgment in all other respects.

## II. FACTUAL BACKGROUND

A. *Prosecution Evidence*

At trial, the primary disputed issue was whether defendant was one of two men who shot at a group of African-Americans, including 13-year-old Anthony Sweat, while the group was sitting on two adjoining porches on the evening of July 14, 2002, in an

3

area of Riverside claimed by the East Side Riva (ESR) criminal street gang. At the time of the shooting, defendant was a documented and self-admitted ESR member.

1. The July 14, 2002, Shooting

At the time of the July 14, 2002, shooting, Sweat lived in an apartment of a house on University Avenue in Riverside with his mother Terina Anderson (Terina), his 17-year-old sister Taren Anderson (Taren), a younger sister, and friends of his mother. Sweat and his family were African-American. Taren knew defendant through her mother Terina. Taren identified defendant at trial as a Hispanic person she knew as "Shorty" who had previously been in their home.

Around one week before Sweat was shot on July 14, 2002, Taren had a verbal altercation with defendant at a "Circle 1" store, approximately one block from Taren and her family's University Avenue apartment where the shooting took place. According to Taren, the altercation with defendant "didn't end peaceful[ly]."

On the evening of July 14, 2002, Sweat and Taren were socializing on their front porch and their neighbors' adjoining front porch with several other African-Americans, including 15-year-old Christopher S., 18-year-old Elliot Woods, and two other men named Tywan and Tyric. Woods lived with his parents in the apartment next to Taren and Sweat's family. According to Taren, Tyric had "[b]lood gang ties" and was stealing from people in 2002.

Around 11:00 p.m., approximately one hour before the shooting, two apparent but unidentified "gang bangers" wearing "hoodies" and gloves were walking on University

4

Avenue, across the street from the porches, staring at the group in a confrontational way. Around 11:15 p.m., David A. rode by on a bicycle and made a gesture with his hands as if pulling a trigger and firing a gun at the residence. A couple of minutes after David A. rode by, an unidentified Hispanic man approached the group and asked whether they wanted a beer. Tywan walked with the man to the Circle 1 store to get beer. The two of them later returned to the porches, the Hispanic man spoke with the group for a couple of minutes, then he left.

Moments after the unidentified Hispanic man left, Taren went inside her apartment to put her little sister to bed, then she came back outside to tell Sweat it was time to come inside. After she came back outside, she noticed that the chair Tyric had been sitting on was "falling over" and Tyric was gone. Around 30 second later, "the shooters came."

Two Hispanic men approached the group on the porches through a gate from an alleyway on the side of the house. Both men were dressed in black and had silver handguns. They uttered racial slurs against African-Americans, yelled out "Eastside Riva" and "What's that Duke's life" or "What's that Duke like?" and began shooting at the group.

One of the shooters fired a handgun six inches in front of Woods's face, then ran past Woods, bumping into him. Woods and Tywan ran across a field and found refuge at a nearby McDonald's restaurant. Christopher S. ran through the same field and hid at a house. Sweat and Taren ran toward another field along a gated area.

5

The shooters turned around and went back through the alley, which brought them within view of Sweat and Taren behind the apartments. Woods saw one of the shooters chasing Taren and Sweat. Taren yelled, "[Sweat] turn around. There they go." Taren ran toward University Avenue and flagged down Officer Francisco Hoyos in a patrol car. Taren then returned to the alley and found Sweat there, lying face down. Sweat had been shot three times and died as a result of his injuries.

Taren saw the shooters run to a dark-colored car at the end of the alleyway near the corner of Sedgwick and University Avenues. They got into the car and the car drove away. Just before Taren flagged him down, Officer Hoyos did not hear any shots from inside his patrol car but he noticed a green sedan cross over University Avenue on Sedgwick Avenue. The lights in his patrol car were off at the time and there was no other traffic in the area.

2. The Witnesses's Descriptions of the Shooters

(a) *Taren*

Taren told Officer Hoyos that the shooters were Hispanic males, around 21 years of age, five feet six inches tall, 160 pounds, and wearing black hooded sweatshirts, black beanies, and black gloves. Later on July 15, 2002, Taren told Detective Rita Cobb she did not believe she could identify the shooters but gave a description of them similar to the one she gave Officer Hoyos.

On July 22, 2002, Taren identified Francisco (or Franco) C. and David A. as the shooters from separate photographic lineups presented to her by Detective Steven

6

Shumway. At trial in 2011, Taren testified she recognized Francisco C. and David A. by their eyes, which she could see through the ski masks they were wearing. David A. and Francisco C. were born in 1986 and were approximately 16 years old in 2002.

(b) *Christopher S.*

Detective Shumway interviewed Christopher S. on July 15 and 19, 2002. Christopher S. described the shooters as Hispanic males, 19 to 21 years of age, between five feet six and five feet eight inches tall, between 130 and 140 pounds, and wearing dark-colored clothing, dark-colored beanies, and black gloves. During the first interview, Christopher S. was unable to identify anyone from various photographs the detective showed him, but during the second interview he identified David A. from a six-pack photographic lineup, saying David A. looked like one of the shooters but he was not absolutely certain. Detective Shumway did not show Christopher S. a photographic lineup including Francisco C.'s photograph because Christopher S. said he would not be able to identify anyone else.

(c) *Woods*

Several days after the shooting, Detective Shumway presented a photographic lineup to Woods, who identified David A. as one of the shooters with a 90 percent certainty. Woods was 100 percent certain David A. was the person who rode by on the bicycle and made a shooting gesture to the group before the shooting. Woods did not identify Francisco C. in another photographic lineup. Woods also told police that Albert Vargas looked like one of the shooters.

7

At trial in 2011, Woods said he was unable to discern the races of the shooters but he believed one of them was wearing a dark blue beanie with the hoodie pulled over his face. Woods did not recall identifying David A. as one of the shooters nine years earlier. Woods estimated the shooter who shot in front of his face was five feet six inches to five feet eight inches tall.

3. <u>The Recovered Clothing, Silver Handgun, Shell Casings, and Projectiles</u>

Lena Soule, who lived near the intersection of the alleyway and Sedgwick Avenue where the shooters were seen getting into a car after the shooting, notified officers of a gun and clothing she found discarded on the lawn beside her home. At that location, a field evidence technician recovered a silver-finished and black-handled .357-caliber Smith & Wesson revolver, two black knit gloves, a black "Rollin Hard logo" T-shirt with two pit bulls on it, and a black knit ski mask.

Four expended .357-caliber cartridges and two expended .38 special cartridges were inside the cylinder of the Smith & Wesson .357-caliber revolver. Two partial latent fingerprints taken from the revolver were of insufficient quality to compare for identification. Detective Jim Lopez recovered nine expended nine-millimeter shell casings from the vicinity of the front porches where the victims had been congregating and three "nominal .38 caliber" projectiles from the ground around the porches.

Criminalist Steven Dowell analyzed several particles of gunshot residue (GSR) found on each glove. It was not possible to determine when the GSR was deposited on the gloves, but the gloves were either in close proximity to a discharged firearm (because

8

gunshot particles can travel up to 14 feet in the muzzle direction and two and one-half feet in other directions) or came into contact with another object with the same proximity to a discharged firearm when the GSR was deposited on them.

Michele Nichols, a criminalist and firearms examiner, testified that semiautomatic guns expel expended cartridges, but revolvers do not. Based on microscopic firing marks on the recovered nine-millimeter cartridges, Nichols concluded that all of the nine-millimeter cartridges were fired from a single gun. Nichols also test fired the Smith & Wesson revolver, which was capable of using either .357-caliber or .38 special ammunition. After comparing the test-fired bullets to the projectiles recovered from the scene, Nichols concluded one of the projectiles could have been fired from the Smith & Wesson revolver or any other gun with similar land groove widths.

4. The DNA Evidence Linking Defendant to the Clothing

Criminalist Daniel Gregonis explained the science of DNA typing. The black knit gloves, a portion of the black ski cap's headband, and a half-inch portion of the collar from the black T-shirt recovered from the alley behind the scene of the shooting were submitted to Gregonis for analysis. Gregonis was also provided with blood samples from defendant, defendant's wife, Francisco C., and David A.

Gregonis generated DNA profiles from the blood samples and clothing. The DNA on the T-shirt and ski cap were analyzed in 2003, and the DNA on the gloves was analyzed in 2006. The DNA found on the half-inch portion of the T-shirt collar consisted of a mixture of three individuals: a major female donor, a minor male donor, and a trace-

9

level donor. The DNA profile of defendant's wife was consistent with the major female donor. The DNA profile of defendant was consistent with the minor donor, with that profile occurring in 1 in 6 billion Hispanics, 1 in 11 billion African-Americans, and 1 in 1.4 billion Caucasions. David A. and Francisco C. were excluded as possible donors of the DNA on the T-shirt collar.

The black knit gloves had a DNA mixture consisting of one major donor and one minor donor. The DNA profile of defendant was consistent with the major donor, with that profile occurring in 1 in 170 trillion Southwestern Hispanics, 1 in 21 trillion Caucasions, and 1 in 290 trillion African-Americans. Francisco C. and David A. were excluded as possible donors of the DNA on the gloves.

Gregonis was only able to generate a partial and "very weak" DNA profile from the headband of the ski cap. Defendant, his wife, and Francisco C. were not excluded as possible donors to the DNA on the ski cap, but the DNA profile was so weak it occurred in approximately 8 out of every 10 people chosen at random, or 1 in 1.3 Southwestern Hispanics, 1 in 1.3 Caucasions, and 1 in 1.4 African-Americans. David A. was excluded as a possible donor, however.

5. <u>Detective Shumway's October 2003 Interview With Defendant</u>

Detective Shumway interviewed defendant on October 16, 2003, more than a year after the July 14, 2002, shooting. Detective Shumway told defendant he was investigating a homicide, and defendant responded by saying: "I wasn't involved in any

10

shooting." Defendant also said he had only just met Sweat's mother at a "People Against Violence" march.

Before defendant made these statements, Detective Shumway did not tell him the homicide he was investigating involved a shooting, but he admitted defendant may have spoken to "somebody else" who may have told him the detective was investigating a shooting or Sweat's murder specifically. Defendant was cooperative during the interview.

6. Expert Gang Testimony

Detective Joe Miera testified as an expert for the prosecution on criminal street gangs. The ESR, a Hispanic gang, and the 1200 Blocc Crips, an African-American gang, were the predominant criminal street gangs in the "University corridor" area of Riverside, and the gangs were rivals. The July 14, 2002, shooting occurred in an area claimed by both gangs. The two gangs had been committing acts of violence against each other since 1991, but the summer of 2002 was a particularly violent period.

Respect and fear are synonymous in the gang culture. Gangs control their territory by committing acts of violence and thereby instilling fear of the gang in the community. A gang member establishes his position within the gang by committing crimes or acts of violence. Law enforcement agencies identify and document gang members through field interview cards, informants, custodial classifications, admissions, tattoos, and associations with other gang members.

11

In 2002, the ESR had around 500 documented members, and its most violent and highest ranking clique, the "Tiny Dukes" had 5 to 10 members. Lower-ranking ESR cliques, primarily consisting of younger gang members, included the Traviesos and Patterson Park cliques. ESR members could progress from Patterson Park, to Traviesos, to the Tiny Dukes. There were other ESR cliques and some ESR members did not claim any clique. The ESR's primary activities included drug sales and violent crimes.

In 1995, 2001, and April 2002, defendant admitted to police officers that he was a member of the Traviesos clique and his moniker was "Shorty." On June 6, 2002, defendant was contacted by officers in the El Cowboy Bar, five or six blocks from the scene of the July 14, 2002, shooting. On July 17, three days after the shooting, defendant was contacted in the same bar in the company of Israel Amezquita, a member of the Tiny Dukes, Robert Corrillo, the "president" of the Tiny Dukes, and two other ESR members, Hector Perez and Robert Gonzales. Defendant was five feet six inches tall and weighed 160 pounds in July 2002.

In February 2004, officers searched defendant's home and found items with the name "Shorty" and "ESR" graffiti on them. During a March 2004 search of defendant's home, officers found a Duke University Blue Devils cap with a symbol the Tiny Dukes had adopted, and items with either ESR or Tiny Dukes symbols or the name "Shorty" written on them. More ESR and Tiny Dukes graffiti was found in defendant's home in May 2006. Defendant also had ESR-related tattoos, including "Tiny Dukes," on the front of his head, inside the hairline.

12

Detective Miera opined defendant was a member of the ESR in 2002 and "at some point in time" graduated to the Tiny Dukes. His graduation from the Traviesos to the Tiny Dukes was for a "select few" but was not unusual. David A., who was known as "Little D," and Francisco C., who was known as "Little Scrawny," were members of the Patterson Park clique in 2002.

In response to a hypothetical of a shooting directed at several African-Americans in the University corridor area with references to the ESR and "Dukes Life" prior to the shooting, Detective Miera opined the shooting was committed for the benefit of the ESR. The shooting would benefit the ESR by bolstering its reputation for violence. The fact the shooting victims were not members of the 1200 Blocc Crips did not change the detective's opinion because the ESR was known to attack African-Americans who were not gang members.

B. *Defense Evidence*

The defense was that defendant was not one of the shooters and emphasized the victims' initial and various identifications of David A. and Francisco C. as the shooters. The defense also emphasized there was very little physical evidence linking defendant to the shooting, and his DNA on the gloves and T-shirt, and the possibility of his DNA on the ski cap, were insufficient to prove his guilt beyond a reasonable doubt.

1. The Witnesses's 2007 Statements to Mark Magill

(a) *Christopher S.*

In June and July 2007, Riverside County District Attorney Investigator Mark Magill interviewed several of the shooting victims. In 2002, Christopher S. was a member of the "All Black Kings," also known as ABK, and his moniker was "Chunky." The ABK was a "tagging crew" which wrote graffiti. According to Christopher S., the ABK had "no real problems" with the ESR, but ESR members had once crossed out ABK graffiti, a sign of disrespect. In February 2004, Christopher S. had an altercation with Peter Valdez, an ESR member. Matthew Woods, who was on the adjoining porch at the time of the July 14, 2002, shooting, was also an ABK member.

Christopher S. told Magill he did not see the shooters' faces, and speculated that one of the shooters was a person named "Scrawny," whom he had seen a couple of times before. Though Francisco C. was known as "Little Scrawny," Christopher S. did not identify a photograph of Francisco C. as one of the shooters in 2007. In 2002, Christopher S. identified David A. from a photographic lineup, saying David A. looked like one of the shooters, but he was not absolutely certain. Christopher S. was not shown a photographic lineup with Francisco C. in it in 2002 because he said he would not be able to identify anyone else.

Christopher S. told Magill that, during 2002, Terina was involved in selling "bunk" or bad drugs at her residence with her boyfriend Tyric and with Christopher S.'s assistance. Christopher S. described an incident that occurred during the day on July 14,

14

2002, in which Tyric took a bicycle from a Hispanic person after having a physical confrontation with the person at the McDonald's restaurant near the scene of the subsequent shooting.

(b) *Woods*

Magill spoke with Woods in June 2007. Despite his July 2002 statement to Detective Shumway that he was 90 percent certain David A. was one of the shooters, Woods told Magill in June 2007 that Anthony and Albert Vargas were "probably the shooters," but he could not see the shooters' faces and was only offering a theory of who the shooters might have been. To Magill, Woods described one of the shooters as wearing baggy creased pants, one as wearing a dark beanie, one with his head sticking partly out of his hood, one as having no hair and possibly big ears, and both as wearing dark hooded sweaters.

2. Taren's Statements to Magill

Magill interviewed Taren in Las Vegas in June 2007. Taren described a verbal altercation she had with a short Hispanic male with a lot of tattoos named "Shorty" in the Circle 1 store, across the street from where the shooting occurred, about one week before the shooting. When shown a photograph of defendant, Taren said she recognized defendant as someone she may have seen at her home but she was not sure the photograph was of "Shorty."

During the June 2007 interview, Taren attempted to identify individuals in a photographic lineup whose eyes most looked like the shooters, but she did not identify

15

David A. or Francisco C.  In July 2002, Taren identified David A. and Francisco C. in separate photographic lineups.  At trial in 2011, she testified she recognized Francisco C. and David A. by their eyes, which she could see through the ski masks they were wearing.

### 3.  Terina's Trial Testimony and Prior Statements

Terina testified she knew defendant as "Shorty" in 2002.  Terina admitted she used, purchased, and sold controlled substances, but denied selling out of her home on University Avenue or on the streets of Riverside.  She purchased drugs from defendant through a third person but never purchased them directly from defendant.  Defendant visited the Woods family, who lived in an apartment upstairs from Terina, but defendant was never in Terina's home.  Tyric was a friend who stayed with Terina, but Tyric was not her boyfriend and she was not aware of him selling drugs or bunk, or stealing from Hispanics.

In July 2003, Terina was interviewed by Riverside County District Attorney Investigator David Hussey.  Terina told Hussey she had been threatened several times.  In March 2003, the window of her car (which she had purchased from a Tiny Dukes member) was smashed and the letters "TDK" were written inside the vehicle.  In June 2002, she was driving near University Avenue when she saw flashes and believed someone was shooting at her car.  She denied telling the investigator that these events occurred in 2002.

16

Magill interviewed Terina in June 2007.  Terina said she had stopped selling drugs just before Sweat's death and Tyric was not involved in drug sales but was "jacking" Hispanics.  And although Terina also said she had been involved in drug sales with a person named "Shorty" in 2002, she did not recognize a 2006 photograph of defendant.

4.  Defendant's Brother Arturo G.

In March 2002, defendant's younger brother, Arturo G., was ordered to live with defendant as a condition of his juvenile probation.  Arturo G. testified defendant owned an Acura, an Altima, and an S-10 pickup truck which was broken into in July 2002.  While living with defendant, Arturo G. was an ESR gang member with the moniker "Baby Shorty" and was friends with David A. and Francisco C.  Arturo G. was at defendant's home at the time of the July 14, 2002, shooting.  Arturo G. did not own beanies or knit gloves like those found at the crime scene, but David A. was wearing a pair of knit gloves when he, Francisco C., and Arturo G. were stopped by the police on April 21, 2002.

5.  Defendant's Wife Maria Barbarin

Defendant's wife Maria Barbarin testified she lived with defendant, their daughter, and Arturo G. on Lime Street in 2002.  She testified that defendant owned a burgundy Cutlass Supreme, a grayish Altima, and a gray-brown S-10 pickup truck, but never owned a green car.  David A. and Francisco C. visited Arturo G. at the Lime Street home.  Defendant also hung out at the El Cowboy Bar, Terina met him several times at the Lime

17

Street home, and defendant met Terina one time at a house on Panorama Road. Maria believed defendant got along well with African-Americans.

6. Character Witnesses

Raymond Griffin testified he was "one of the major drug dealers on the east side of Riverside" who "ran two major drugs houses" in the mid-1990's and sold cocaine. Previously, Griffin was a member of the Los Angeles Main Street Crips gang. In 2001, defendant's mother and sister lived behind Griffin's residence; Griffin later met defendant; and they became friends. In 2002, Griffin associated with active ESR gang members, including defendant, and loaned defendant $200 after his truck was burglarized.

Defendant sold methamphetamine but was not one of Griffin's competitors. Griffin and defendant never discussed gangs, there were no conflicts between them due to Griffin's African-American race, and Griffin had never seen defendant show prejudice against African-Americans. Defendant had asked Griffin to be a character witness for him.

Robert Lampkin was also a former member of a Crips gang. He met defendant through Arturo G. in 2000. Lampkin bought drugs from defendant and they became friends. According to Lampkin, defendant was an ESR member who claimed the Tiny Dukes clique. In 2002, Lampkin was a drug dealer, and defendant and others supplied him with the methamphetamine he sold. Lampkin never observed defendant exhibit racial prejudice against him or any other African-Americans.

18

In 2002, Lampkin and defendant were at the El Cowboy Bar around midnight or 1:00 a.m. when Lampkin heard gunshots which seemed to be coming from the vicinity of 14th Street and University Avenue. Thereafter, he heard a police helicopter from the same area. Lampkin shook defendant's hand and left, and a day or two later heard Sweat had been murdered. Lampkin had also heard about other shootings, however.

In 2002, defendant and Derrick Armelin were associates in the drug trade. Defendant supplied Armelin with drugs and they socialized together. Armelin would sometimes "party" with Terina at her house; he had seen her there with defendant once or twice; and their meetings involved drug transactions. Armelin knew defendant was in the Tiny Dukes in 2002, but he never heard defendant make any derogatory comments against African-Americans. Armelin had been arrested for check fraud, burglary, and identify theft.

Tonell Love was serving a state prison sentence for embezzlement at the time of defendant's trial in 2011. He had been arrested for vehicle thefts in 2003 and 2006, and for embezzlement and impersonating an officer in 2009. In February 2005, Love and Francisco C. were housed together in county jail. Riverside County District Attorney Investigator Michael Petti contacted Love and asked him to provide information about Francisco C. Love told Petti about a conversation he overheard between Francisco C. and another inmate, and at the conclusion of the interview asked if he could be released early in exchange for the information he provided.

19

Love testified Francisco C. told the other inmate that he, Francisco C., was in custody for a murder involving "a .357" and a 12-gauge shotgun which occurred in front of a Circle 1 store and involved three people. Francisco C. said that after the murder he ran to the corner and left in a friend's or a cousin's vehicle; one of his accomplices fled as well; and the third accomplice did not get away. Francisco C. said he was arrested with his shotgun while smoking marijuana with his cousins; one of his "homeboys" who was also involved in the murder placed the shotgun where the police found it; and Francisco C.'s fingerprints were on the shotgun. Francisco C. did not mention the names of the other two individuals who were involved in the murder.

C. *Prosecution Rebuttal*

Detective Shumway testified that no shotgun was recovered from the scene of the July 14, 2002, shooting or anywhere else in relation to the shooting.

III. DISCUSSION

A. *Substantial Evidence Shows Defendant Was One of the Shooters and Thus Supports His Murder and Attempted Murder Convictions*

Defendant claims his convictions must be reversed because there was insufficient evidence he was one of the shooters, specifically arguing the evidence pointed toward David A. and Francisco C. as the shooters. As will appear, defendant reargues the evidence presented at trial, views the facts in the light least favorable to the prosecution, and disregards substantial evidence, including the DNA taken from the T-shirt and gloves

20

and other circumstantial evidence, supporting a reasonable inference that he was one of the shooters.

The applicable standard of review is well settled. (*People v. Jennings* (2010) 50 Cal.4th 616, 638.) "'"When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt."'" [Citations.]" (*People v. Hill (*1998) 17 Cal.4th 800, 848-849; *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

We "'must . . . presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.]" (*People v. Johnson* (1980) 26 Cal.3d 557, 576-577.) We may not reverse a conviction merely because circumstances might support or be reconciled with a contrary finding. (*People v. Kraft* (2000) 23 Cal.4th 978, 1054.) We neither reweigh the evidence nor reevaluate the credibility of witnesses. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) The standard of review is the same when, as here, the People relied primarily on circumstantial evidence. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.) Reversal is warranted only when it clearly appears that "upon no hypothesis whatever is there sufficient substantial evidence to support" the conviction. (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

Viewing the evidence in the light most favorable to the prosecution, the jury could have reasonably concluded defendant was one of the July 14, 2002, shooters. Officers

recovered a black T-shirt, two black gloves, and a black ski cap from the alley behind the shooting, near the corner of Sedgwick Avenue, where the shooters were seen entering a waiting car and driving away immediately after the shooting. Defendant's DNA profile matched the major donor DNA profile taken from the gloves, the minor DNA profile taken from the T-shirt, and he could not be excluded as a donor of the DNA found on the ski cap. Defendant's wife's DNA was consistent with the female contributor to the DNA on the T-shirt and ski cap. Near the clothing, a .357-caliber Smith & Wesson that could have been used in the shooting was recovered, and both gloves had GSR residue on them.

The witnesses to the shooting consistently described the shooters as wearing black or dark-colored T-shirts, gloves, and beanies. They also consistently stated that "Eastside Riva" and something like "What's that Duke's life" were yelled out just before the shooting, signifying the shooting was for the benefit of the ESR and was likely being committed by a member of its highest-ranking Tiny Dukes clique or an ESR member aspiring to be promoted to the Tiny Dukes.

Defendant was longtime ESR member at the time of the shooting, and substantial evidence showed he was promoted to the Tiny Dukes sometime after the shooting. Before the shooting, he admitted being a member of the Traviesos clique, the clique immediately below the Tiny Dukes. Three days after the shooting, on July 17, 2002, he was contacted in a bar near the scene of shooting in the company of two Tiny Dukes members, including its "president" and two other ESR members. Defendant had "Tiny

22

Dukes" tattooed on his forehead and items with Tiny Dukes symbols were recovered from his home after the shooting.

Defendant claims the evidence pointed to David A. and Francisco C. as the shooters, but these men were excluded as potential donors to the more complete DNA profiles taken from the T-shirt and gloves. Further, defendant's physical appearance in July 2002—Hispanic, five feet six inches tall, and weighing 160 pounds—generally matched the descriptions of the shooters given by Taren to Officer Hoyos immediately after the shooting, by Christopher S. to Detective Shumway only several days after the shooting, and by Woods at the time of trial.

In addition, Taren had a verbal altercation with defendant only one week before the shooting at the Circle 1 store, immediately across the street from the shooting in ESR territory. This gave defendant an additional motive for the shooting—the disrespect of an African-American individual arguing with him on his gang's turf.

Defendant presented much evidence that he harbored no racial animus toward African-Americans, had African-American friends, and had dealt drugs with them. But the evidence also showed that Tyric, who was on the porch with the other congregating African-Americans shortly before the shooting, had been dealing bad drugs or "bunk" and had been stealing from Hispanics. The expert gang testimony showed defendant could have raised his standing in the ESR by committing the shooting, even if defendant had no particular or personal racial animus toward African-Americans.

23

Finally, the jury could have reasonably inferred defendant had consciousness of guilt when he told Detective Shumway he hadn't been involved in any shooting, even though the detective did not say he was investigating a shooting. To be sure, the detective testified defendant could have learned from someone else that the detective was investigating the July 14, 2002, shooting and Sweat's murder. But defendant also said he had only recently met Terina, when other evidence showed defendant had known Terina since well before the shooting, had dealt drugs with her, and had been in her home. Based on his statement that he had only recently met Terina, the jury could have reasonably inferred that defendant was trying to distance himself from Terina and the shooting because he had a consciousness of guilt.

Based on the entire record, the jury could have reasonably concluded that defendant was one of the July 14, 2002, shooters. Accordingly, substantial evidence supports defendant's murder and attempted murder convictions.

B. *Third Party Culpability Evidence Was Properly Excluded*

Defendant claims the court erroneously refused to allow him to introduce third party culpability evidence, namely, evidence that David A. and Francisco C. assaulted African-Americans in ESR territory on two separate occasions in September and November 2001, and that racial epithets were uttered during the assaults. He argues the evidence was relevant and admissible to show David A. and Francisco C. harbored racial animus toward African-Americans and, for this reason, likely perpetrated the July 2002 shooting.

24

1. Relevant Background

In cross-examining the prosecution's gang expert, Detective Miera, defense counsel elicited evidence that gang members who are "just coming up" and who want to gain respect are more likely to become involved in violence to prove themselves. By 2002, the rivalry between the ESR and 1200 Blocc Crips had escalated to the point where ESR members were perpetrating violence against African-Americans who had no gang ties, and vice versa.

In 2002, David A. and Francisco C. were 16-year-old members of the Patterson Park clique, the lowest ranking clique of the ESR. Members of Patterson Park may aspire to become Tiny Dukes, the highest ranking and most violent ESR clique. Detective Miera agreed that if a Hispanic man made a shooting gesture toward a group of African-Americans on University Avenue in July 2002, as the evidence showed David A. had done, it would have been perceived as "some sort of disrespect or challenge."

Defense counsel then presented Detective Miera with a letter that Francisco C. wrote to defendant's half brother, Arturo G., another ESR gang member, in which Francisco C. wrote: "I seen [a] couple of snails." "Snails" was a derogatory term that ESR members used for 1200 Blocc Crips. Detective Miera had no information that defendant had engaged in any criminal activity or violence with David A. or Francisco C., or that defendant ever harbored racial bias against African-Americans beyond his membership in the ESR.

25

Defense counsel then asked Detective Miera about a September 12, 2001, assault allegedly committed by David A. and Francisco C. in ESR territory against Henderson Combs, an African-American. Detective Miera was familiar with the incident, and said he believed David A. and Francisco C. used racially derogatory terms or statements during the assault. The prosecutor objected to this testimony as irrelevant and as improper character evidence and moved to strike it. The trial court sustained the objection and struck the testimony about "this particular assault . . . as irrelevant, based upon the time period that's being questioned about," and directed the jury to disregard it.

The court then held a bench conference sua sponte, concerning the extent to which the defense could elicit evidence concerning racially-motivated assaults by David A. and Francisco C. The court noted there was evidence that David A. and Francisco C. were ESR members and that the ESR and the 1200 Blocc Crips were engaged in a "racial war." But the court pointed out that whether David A. or Francisco C. had assaulted African-Americans in the past would be character evidence, offered to show they acted in conformity with that character in committing the July 14, 2002, shooting. (Evid. Code, § 1101, subd. (a).)[2] The court also found the prior act evidence more prejudicial than probative in part because the evidence that racial epithets were uttered during the prior assaults was based on hearsay to Detective Miera. (§ 352.)

_____

[2] All further statutory references are to the Evidence Code unless otherwise indicated.

26

Defense counsel argued Detective Miera had used a "broad brush" in suggesting that all ESR gang members had racial animus, and part of defendant's defense was that he had no racial animus toward African-Americans. Counsel also argued that if defendant had been involved in a prior assault against African-Americans, that evidence would be admitted. (§ 1101, subd. (b).) Counsel explained he was trying to show that David A. and Francisco C. perpetrated the charged crimes, and in September and November 2001, both were involved in racial assaults against African-Americans and used racially derogatory remarks during the assaults.

To make a record of the proffered, excluded evidence, defense counsel offered to show that on September 12, 2001, David A. and Francisco C. chased and beat Henderson Combs, an African-American, referred to Combs as the Jackson Five and said "[f]uck 1200 Blocc" and "[d]on't mess with ESR." On November 26, 2001, David A., Francisco C., and Mario Sanchez attacked Dominick Ward, an African-American, in ESR territory, and during the assault Ward was referred to as a 1200 Blocc member, although he was not, and ESR signs were "thrown at [Ward]" as he was being physically assaulted.

The court ruled that the defense could introduce evidence of the relationship between David A., Francisco C., and Arturo G., and also elicit evidence that Detective Miera had no knowledge of defendant having any involvement in attacking any African-Americans. Detective Miera then testified there were a number of violent attacks by ESR members against African-Americans in and around 2002, and that David A. and

27

Francisco C. were involved in some of the attacks, and Miera had no knowledge of defendant being involved in any of the attacks.

Detective Miera further testified that David A., Francisco C., and Arturo G. were contacted together in ESR territory on April 21, 2002, and in the detective's opinion were associated together at that time. During a search of David A.'s residence on July 22, 2002, officers found gang paraphernalia and a piece of paper with "[f]uck all snails" written on it. This was a derogatory comment showing disrespect to the 1200 Blocc Crips and a common characteristic of ESR gang members. A black jacket, a black hooded sweatshirt, a black beanie cap, and a black T-shirt were also found during the July 22 search.

2. Analysis

Third party culpability evidence is generally admissible if it raises a reasonable doubt of the defendant's guilt. (*People v. McWhorter* (2009) 47 Cal.4th 318, 367; *People v. Hall* (1986) 41 Cal.3d 826, 833.) To meet this standard, the evidence must "'link the third person either directly or circumstantially to the perpetration of the crime.'" (*People v. McWhorter, supra,* at p. 367.) By contrast, third party culpability evidence is inadmissible if it "'simply affords a possible ground of possible suspicion'" that someone other than the defendant committed the charged crime. (*People v. Hall, supra,* at p. 832.) Mere evidence of motive or opportunity of another person, without more, is inadmissible. (*Ibid.; People v. DePriest* (2007) 42 Cal.4th 1, 43.)

Third party culpability evidence is treated like any other evidence: "'"[I]f relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice or confusion [citation].'" [Citation.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1242.) Third party culpability evidence is also subject to exclusion under section 1101, subdivision (a),[3] which applies to "*any* person, whether or not a defendant." (*People v. Davis* (1995) 10 Cal.4th 463, 501; *People v. Farmer* (1989) 47 Cal.3d 888, 921.) We review a trial court's ruling excluding third party culpability evidence for an abuse of discretion. (*People v. Elliott* (2012) 53 Cal.4th 535, 581.)

We agree with defendant that the reasonable doubt standard was met relative to the 2001 assault evidence here because, apart from the 2001 assault evidence, there was ample evidence linking David A. and Francisco C. to the July 2002 shooting. David A.'s and Francisco C.'s involvement in the 2001 assaults on African-Americans was by no means the only evidence indicating that they had a motive to perpetrate and may have perpetrated the July 14, 2002, shooting. Several of the victims of the shooting identified David A. and Francisco C. as the shooters, or as the possible shooters. David A. and Francisco C. were both young, aspiring ESR members and had an apparent motive to aid the ESR in its ongoing war with the 1200 Blocc Crips by assaulting African-Americans.

---

[3] Section 1101, subdivision (a) provides: "Except as provided in this section . . . evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

Their participation in the July 14, 2002, shooting would have raised their standing in the ESR and perhaps qualified them to join its top-tier clique, the Tiny Dukes.

That said, the trial court did not abuse its discretion in excluding *the details concerning* the 2001 assaults under sections 1101, subdivision (a) and 352,[4] including the dates the assaults occurred and that racial epithets were used.  To be sure, the evidence of the 2001 assaults, coupled with the evidence that David A. and Francisco C. were up and coming ESR members with a motive to assault African-Americans, tended to show David A. and Francisco C. had a motive to perpetrate the July 14, 2002, shooting.  (§ 1101, subd. (b);[5] see *People v. Spector* (2011) 194 Cal.App.4th 1335, 1381 [other crimes evidence admissible to show motive for committing charged offense where "'[b]oth crimes are explainable as a result of the same motive.'"].)  But as the trial court astutely pointed out, the defense was offering the date and racial epithet evidence to show David A. and Francisco C. acted in conformity with their character for racial animus against African-Americans by perpetrating the July 14, 2002, shooting.  This was impermissible. (§ 1101, subd. (a).)

---

[4] Section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[5] Section 1101, subdivision (b) provides, in part:  "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, . . . identity, . . .) other than his or her disposition to commit such an act."

In any event, the exclusion of the evidence was harmless. (*People v. Hall, supra,* 41 Cal.3d at p. 836 [exclusion of third party culpability evidence reviewed for harmless error under standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836].) Even though the jury did not hear the specifics of the 2001 assaults, including that racial slurs were uttered, that the assaults occurred in September and November 2001, or the names of the persons assaulted, the jury heard ample evidence that David A. and Francisco C. were "up and coming" ESR members, *they were involved in a number of ESR-related assaults on African-Americans in and around 2002*, and they had a motive to perpetrate the July 2002 shooting because it would have enhanced their standing in the ESR. The jury also heard that Detective Miera had no information that defendant had been involved in *any* assaults with David A. and Francisco C. on African-Americans or otherwise, and that, apart from his ESR membership, defendant had *no motive* to assault African-Americans because he had drug-related business dealings with African-Americans. In view of the entire record it is not reasonably probable that the exclusion of the details of the 2001 prior assaults by David A. and Francisco C. had any effect on the verdicts or findings. (*People v. Watson, supra,* at p. 836.)

Nor, for the reasons discussed, did the exclusion of the evidence deprive defendant of his right to present a defense. "Because the trial court merely rejected some evidence concerning a defense, and did not preclude defendant from presenting a defense, any error is one of state law and is properly reviewed under *People v. Watson, supra,* 46 Cal.2d at page 836." (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.) Any error was

31

also harmless beyond a reasonable doubt because the verdicts and findings were "surely unattributable" to any error in excluding the details of the prior assaults. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279; *Chapman v. California* (1967) 386 U.S. 18, 24.)

C. *The Court Did Not Abuse Its Discretion in Admitting the Statistical Evidence Concerning the "Very Weak" DNA Profile on the Ski Cap*

The prosecution was allowed to introduce expert testimony that the DNA profile taken from the ski cap was consistent with defendant's DNA profile and that of 8 in 10 people chosen at random. Defendant claims that statistical evidence should have been excluded as both irrelevant and unduly prejudicial. He concedes it was "reasonable for Gregonis to be permitted to testify that he tested the cap, so the jury would not think law enforcement was negligent in its investigation," but argues Gregonis "should have been permitted to go no further than stating that the weak profile was insufficient to reach any conclusions." We disagree.

To be sure, "evidentiary rules limit the admission of scientific evidence to what is reliable, trustworthy, and relevant." (*People v. Pizarro* (2003) 110 Cal.App.4th 530, 541, disapproved on other grounds in *People v. Wilson* (2006) 38 Cal.4th 1237, 1244.) But a trial court has "'considerable discretion'" in determining the relevancy of evidence. (*People v. Clark* (2011) 52 Cal.4th 856, 922.) Evidence is relevant if it tends ""logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citations.]" (*People v. Williams* (2008) 43 Cal.4th 584, 633-634; § 210.) A trial court's rulings on whether evidence is relevant or

32

should be excluded under section 352 are reviewed for abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 550-551.)

"Generally, as in this case, DNA evidence consists of two distinct elements: the *match evidence*—evidence that the defendant *could be* the perpetrator; and the *statistical evidence*—evidence that a certain number of people in the population could be the perpetrator." (*People v. Pizarro, supra,* 110 Cal.App.4th at p. 541, fn. omitted, some italics added.) Match evidence has the effect of directly incriminating the defendant, as establishing he could be the perpetrator, but does not establish the defendant is the perpetrator. (*Id.* at pp. 541-542.)

"The statistical evidence gives the match evidence its weight. It is an expression of the rarity of the perpetrator's profile, the size of the pool of possible perpetrators, and the likelihood of a random match with the perpetrator's profile. Specifically, the purpose of the statistical evidence is to establish *how few people* in the relevant population genetically match the perpetrator." (*People v. Pizarro, supra,* 110 Cal.App.4th at p. 542; *People v. Venegas* (1998) 18 Cal.4th 47, 82 ["[t]he evidentiary *weight* of the match with the suspect is . . . inversely dependent upon the statistical probability of a similar match with the profile of a person drawn at random from the relevant population," italics added].)

The trial court plainly did not abuse its discretion in allowing Gregonis to testify that defendant could not be excluded as a possible donor to the DNA found on the ski cap, along with around *80 percent* of the general population. Defendant argues that the

"eight in 10" statistical evidence "could only lead to speculative inferences" that he deposited the DNA on the ski cap, Not so. The evidence was not offered to show defendant *was*, in fact, a donor to the DNA on the ski cap; to the contrary, it was offered to show he *could not be excluded* as a possible donor. This was an important issue in the case, in view of the evidence that defendant's DNA profile conclusively matched the major-donor DNA profile taken from the gloves and the minor-donor DNA profile taken from the T-shirt, which were found in the alley behind the shooting *with* the ski cap and the Smith & Wesson handgun which ballistics evidence showed could have been used in the shooting.

In view of other DNA evidence linking defendant to the gloves and T-shirt, the "eight in 10" statistical evidence concerning the ski cap went to its weight, not its admissibility. (*People v. Clark, supra,* 52 Cal.4th at pp. 922-923.) Had Gregonis only been allowed to testify that the DNA profile taken from the ski cap was too weak to draw conclusions as to who deposited it there, the jury would have been deprived of relevant and admissible evidence that defendant was not *excluded* as a possible donor.

*People v. Schulz* (1987) 154 Ill.App.3d 358 [506 N.E.2d 1343] does not aid defendant. There, expert testimony showed the defendant could not be excluded as a donor of seminal fluid found on the victim's rectum because the group of possible donors was 20 percent of the population. The court held the evidence should have been excluded because it had no tendency to prove the defendant committed the crime, essentially because no evidence linked the defendant to the crime. (*Id*. at p. 1348.) That is not the

34

case here.  The "very weak" DNA profile taken from the ski cap was by no means the *only* evidence linking defendant to the shooting.  As indicated, defendant's DNA profiles matched those taken from the gloves and the T-shirt, which were found with the ski cap.

D. *The Trial Court Erroneously Failed to Instruct the Jury Sua Sponte That Defendant's Oral Statements Should Be Viewed With Caution, But the Error Was Harmless*

On October 16, 2003, Detective Shumway interviewed defendant, and began the interview by saying he was investigating a homicide in Riverside.  Defendant responded by saying:  "I wasn't involved in any shooting."  The detective also testified defendant said he had just met the victim's mother on a community march.  Defendant's statements to the detective were not written or recorded.  Defendant later presented evidence that he knew Terina and had dealt drugs with her.  The prosecutor argued that defendant's statements showed a consciousness of guilt.

The jury was instructed pursuant to CALCRIM No. 358 (Evidence of Defendant's Statements):  "You have heard evidence that the defendant made oral statements before the trial.  You must decide whether the defendant made any of these statements, in whole or in part.  If you decide that the defendant made such statements, consider the statements, along with all the other evidence, in reaching your verdict.  It is up to you to decide how much importance to give to the statements."  The jury was not given the bracketed part of the instruction, which reads:  "Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded."  (CALCRIM No. 358.)

35

Defendant did not ask the court to give any part of CALCRIM No. 358, and the record does not show why the bracketed part of the instruction was not given. Still, the trial court had a duty to give the bracketed part sua sponte. (*People v. Beagle* (1972) 6 Cal.3d 441, 455 [trial court has duty to instruct sua sponte that evidence of a defendant's oral statements or admissions must be viewed with caution]; *People v. Wilson* (2008) 43 Cal.4th 1, 19 [same].)

The People concede the error but argue it was harmless. We agree. The reasonable probability standard of review for state law error applies to the erroneous failure to instruct the jury that the defendant's oral statements must be viewed with caution. (*People v. Carpenter* (1997) 15 Cal.4th 312, 393.) The test is whether there is a reasonable probability the jury would have reached a result more favorable to the defendant had the cautionary instruction been given. (*People v. Dickey* (2005) 35 Cal.4th 884, 905.) Under this familiar standard, the error was harmless.

The purpose of giving the cautionary instruction is to assist the jury in determining whether the defendant in fact made the alleged oral statements. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1200.) Caution is required in evaluating whether the defendant made the alleged oral statements because unrecorded, unwritten oral statements may be misheard, misremembered, or misrepresented. (*People v. Bemis* (1949) 33 Cal.2d 395, 399 ["No other class of testimony affords such temptations or opportunities for unscrupulous witnesses to torture the facts or commit open perjury . . . ."].) Nor can it

36

"be assumed that the jury will have in mind the considerations that may affect the weight or credibility of . . . the evidence of the oral admissions of a party." (*Id*. at p. 400.)

Here, the purpose of the cautionary instruction—to view evidence of defendant's oral statements with caution—was essentially served by two other instructions. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016 ["""The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole."""].) First, CALCRIM No. 301 (Single Witness's Testimony) instructed the jury to "carefully review all the evidence" before concluding the testimony of one witness proved a fact. Detective Shumway was the only witness who testified defendant made the alleged oral statements. Additionally, the jury was instructed on various factors to consider in judging the credibility of *all* of the witnesses, including how well they could see, hear, or otherwise perceive the things they testified about and whether they had any biases or prejudices. (CALCRIM No. 226.)

Together, CALCRIM Nos. 226 and 301 accomplished as much as the bracketed portion of CALCRIM No. 358 would have. (*People v. Quach* (2004) 116 Cal.App.4th 294, 299 [failure to give cautionary instruction harmless in view of instruction to "'carefully review all the evidence'" before concluding the testimony of a single witness proved a fact]; *People v. Carpenter, supra,* 15 Cal.4th at p. 393 [failure to give cautionary instruction harmless in view of instructions providing guidance on how to assess witness credibility].) In following these instructions, the jury must have carefully reviewed all evidence before crediting the detective's testimony and must have considered all relevant

factors bearing on the detective's credibility.  (*People v. Edwards* (2013) 57 Cal.4th 658, 746 [courts presume the jury followed the instructions].)

The corpus delicti instruction, CALCRIM No. 379, also instructed the jury that defendant "may not be convicted of any crime based on his out-of-court statements alone."  Nor is there any indication that Detective Shumway mangled or misrepresented defendant's alleged oral statements in any significant way.  (*People v. Dickey, supra,* 35 Cal.4th at pp. 905-906 [in assessing prejudice from failure to instruct jury to view defendant's alleged oral statements with caution, courts consider whether there was any conflict in the evidence about the exact words the defendant used, their meaning, or whether the witness accurately repeated them].)[6]  The detective admitted that defendant may have heard from someone else that he, Detective Shumway, was investigating Sweat's murder and the July 14, 2002, shooting.  Indeed, the record shows Detective Shumway and other detectives interviewed witnesses and that various searches of ESR gang members' homes had been conducted between July 14, 2002, and the time of Detective Shumway's October 15, 2003, interview of defendant.

In view of the entire record, including the instructions, we are not persuaded there is any reasonable probability defendant would have realized a more favorable result had the cautionary instruction been given.  For the same reasons, defendant was not

---

[6] Though in closing argument the prosecutor loosely referred to defendant's statement, "I wasn't involved in any shooting," as "I didn't shoot that kid," the jury was instructed, "Nothing that the attorneys say is evidence."  (CALCRIM No. 222.)

prejudiced by his defense counsel's failure to request the instruction. (*People v. Dickey, supra,* 35 Cal.4th at p. 907.)

We also reject defendant's claim that the failure to give the cautionary instruction violated his due process right to a fair trial and must be assessed under the more stringent beyond-a-reasonable-doubt standard for federal constitutional error. (*Chapman v. California, supra,* 386 U.S. at p. 24.) Our state Supreme Court has held the failure to give the cautionary instruction is an error of state law and is not among the """"very narrow[]"""" categories of error that render the trial fundamentally unfair. (*People v. Carpenter, supra,* 15 Cal.4th at p. 393.) We are bound by this decision. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

E. *No Cumulative Prejudicial Error*

Defendant argues the cumulative effect of the evidentiary and instructional errors so undermines confidence in the judgment as to require reversal. The trial court's only error was in failing to give a cautionary instruction on defendant's alleged oral statements to Detective Shumway, and for the reasons discussed, this error was harmless. Because there were no other evidentiary or instructional errors, there is no cumulative prejudicial error. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1094.)

F. *The Trial Court Was Not Required to Conduct an Evidentiary Hearing to Investigate Defendant's Claim of Possible Juror Misconduct*

    1. Relevant Background

On Thursday, June 9, 2011, the third day of jury deliberations, Juror No. 2 wrote a note to the court asking: "Can you let me off this case because of personal things in the [jury deliberation] room going on[?] [T]hank you[.]" Outside the presence of the other jurors but in the presence of counsel the court asked Juror No. 2 to explain her note. She explained that, in her words, Juror No. 4 would "attack" her when she attempted to explain her "side of everything." She told the court: "I just can't do it anymore." After the court questioned her further, however, Juror No. 2 agreed that she and Juror No. 4 were both "deliberating" and that she could continue to participate in the deliberations if the court admonished all of the jurors that they should discuss the case "civilly with one another."

Neither counsel had any questions for Juror No. 2. Defense counsel noted that the upcoming weekend and three-day break in deliberations, along with the court's admonition to all of the jurors "to be civil" to one another, "might cure the problem." The prosecutor pointed out that some of the jurors may have been impatient because there had been several requests to read back testimony. All of the jurors were then brought into the courtroom and the court admonished all of them that, among other things, they were not advocates for any side; they were supposed to treat each other with respect, dignity, and civility; they could have differing positions; and some of them may "go

40

through various different processes" in reviewing the evidence. The court offered suggestions to improve the deliberations, including how the jurors might "go around the room and have only one person speak at a time."

The jury was then excused for the weekend, resumed deliberating on Monday, June 13, 2011, and returned its verdicts on June 14. On June 15, the court sent the jurors letters thanking them for their service. On July 22, the court received a handwritten letter from Juror No. 4 dated July 13. After complimenting the trial judge on how she had handled the jury selection and trial proceedings, Juror No. 4 complained in her letter that other jurors had "already made up their minds and did not want to bother with discussion," and she, Juror No. 4, had been "repeatedly attacked verbally to the point where [she] simply stopped speaking completely."[7] She went on to say she was "appalled" by the other jurors' conduct; supported a professional jury system; and would not want herself or anyone she cared for "judged by such a group" as defendant's jury.

---

[7] Juror No. 4's letter to the court stated, in part: "[Y]ou probably directed juror #2 to refrain from saying who she thought was causing problems during deliberations, so I will tell you that I had a very difficult time once we were locked in the room. I was shocked to see that I was one of the few that actually followed your instructions and came to the deliberations very much looking forward to actually speaking to someone about the case finally. I was soon caught completely offguard by the fact that people had already made up their minds and did not want to bother with discussion. I won't go into anymore detail than that but it is necessary for you to know at least this much in order for me to comment on one thing: I think it is very important for jurors to know that they have no right whatsoever to attack other jurors for their opinions, perspective, and/or desire to come to a decision in their own way, especially if there is no one to talk to about it, which is what was instructed from day one. I was repeatedly attacked verbally to the point where I simply stopped speaking completely."

41

In September 2011, and after the court provided a copy of Juror No. 4's letter to the prosecutor and defense counsel, defendant filed a petition seeking access to all 12 jurors' personal identifying information for the purpose of developing a motion for new trial based on juror misconduct. (Code Civ. Proc., §§ 206, 237; Pen. Code, § 1181, cls. 3, 4; *People v. Goodwin* (1997) 59 Cal.App.4th 1084, 1089.) In the motion, defendant requested a hearing to determine whether all of the jurors' identifying information should be disclosed, but did not ask the court to order any jurors to appear in court to be questioned in an evidentiary hearing concerning Juror No. 4's allegations of juror misconduct. The People filed an opposition to the motion.

At an October 14, 2011, hearing, the prosecutor told the court that after the verdicts were read Juror No. 4 was the only juror who stayed behind to speak with the prosecutor and defense counsel. At that time, Juror No. 4 raised no concerns about "not being able to participate in any kind of meaningful discussions with other jurors . . . ." She only asked defense counsel why he did not call any character witnesses for defendant.

At the same hearing, defense counsel conceded he had not made a sufficient showing of good cause to release the identifying information of any jurors other than Juror No. 4. (Code Civ. Proc., § 237, subd. (b).) He also conceded he had not made a sufficient showing—based solely on Juror No. 4's letter—to warrant an evidentiary hearing to determine whether any jury misconduct had occurred. (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419 [trial court should hold evidentiary hearing to determine truth

42

or falsity of juror misconduct allegations "only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred."].)

Thus, defense counsel did not ask the court to hold an evidentiary hearing in order to question Juror No. 4 concerning her misconduct allegations. Instead, he only asked the court to notify Juror No. 4 that he was seeking her identifying information, and if she refused to be contacted, to perform a "balancing act" to determine whether to disclose her information. The court found that Juror No. 4's letter was insufficient by itself to show that any juror misconduct had occurred or to warrant an evidentiary hearing to determine whether any misconduct had occurred.

In November 2011, the court sent a letter to Juror No. 4 advising her that the court had provided a copy of her letter to the prosecutor and defense counsel; defense counsel had filed a motion seeking her identifying information in order to speak to her about her letter; and that a December 15 hearing was pending on the motion. (Code Civ. Proc., § 237, subds. (b), (c).) The letter advised Juror No. 4 of the date, time, and place of the hearing and that she could appear in person, in writing, by telephone, or through counsel to object or agree to the disclosure of her personal contact information. (*Id*., subd. (c).) Finally, the court's letter advised Juror No. 4 that if she did not wish her identifying information disclosed, "that would end the matter" and the information would not be disclosed. (See *id*., subd. (d) ["The court shall sustain the protest of the former juror [to the release of his or her identifying information] if . . . the juror is unwilling to be contacted by the petitioner."].)

43

Before the December 15 hearing on defendant's petition, Juror No. 4 left a telephone message for the court saying she did not want her identifying information disclosed; she did not want to further engage in the proceedings; and she did not believe she had anything to say that would have any impact on the result of the trial. (Code Civ. Proc., § 237, subd. (d).) The message was played for the prosecutor and defense counsel. At the December 15 hearing, the court determined it would not release Juror No. 4's identifying information based on her objection. (*Ibid.*) Defense counsel told the court that even though he believed the court had discretion to release Juror No. 4's indentifying information "in the interest of justice," he was "not going to pursue that." The court agreed it would "have that . . . option," but indicated that no evidentiary hearing was warranted or required based on "what was communicated" by Juror No. 4.

2. Analysis

We begin by noting that defendant *does not* challenge the trial court's denial of his petition for access to Juror No. 4's personal identifying information. (Code Civ. Proc., §§ 206, subd. (g), 237.) As defendant concedes, the court had no discretion to release the information after Juror No. 4 objected to its disclosure. (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 382, citing *Jones v. Superior Court* (1994) 26 Cal.App.4th 1202, 1209; Code Civ. Proc., § 237, subd. (d).) As the California Supreme Court has explained: "A criminal defendant has neither a guaranty of posttrial access to jurors nor a right to question them about their guilt or penalty verdict." (*People v. Cox* (1991) 53 Cal.3d 618, 698-699, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421,

44

fn. 22.)  Nor does a criminal defendant have any federal constitutional right to access juror identifying information "even upon a showing of a *strong possibility* of juror misconduct." (*People v. Tuggles, supra,* at pp. 382, 385, italics added.)

As defendant points out, however, a juror's refusal to consent to the release of his or her personal identifying information does not mean the trial court is required to ignore *strong indicia* of juror misconduct.  (*People v. Tuggles, supra,* 179 Cal.App.4th at p. 385.)  A criminal defendant has a constitutional right to a trial by an impartial jury (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; *In re Hamilton* (1999) 20 Cal.4th 273, 293-294) together with a constitutional right to a jury free of serious misconduct (*Smith v. Phillips* (1982) 455 U.S. 209, 220-222).  Trial courts have inherent and statutory authority to manage inquiries into juror misconduct.  (*People v. Tuggles, supra,* at p. 385; *People v. Cox, supra,* 53 Cal.3d at p. 700 [trial court has inherent authority as well as statutory discretion to control the proceedings to ensure the efficacious administration of justice].)  "Thus, where the trial court is presented with *a credible prima facie showing that serious misconduct has occurred*, the trial court *may order* jurors to appear at a hearing and to answer questions about whether misconduct occurred." (*People v. Tuggles, supra,* at pp. 385-386, italics added.)

Defendant claims the trial court deprived him of his rights to impartial verdicts and to a jury free of serious misconduct in failing to conduct an evidentiary hearing, sua sponte, in order to determine whether there was any prejudicial misconduct. Alternatively, he argues his defense counsel rendered prejudicially ineffective assistance

45

of counsel in failing to request such a hearing before he made a motion for a new trial based on juror misconduct. (Pen. Code, § 1181, cls. 3, 4.) He also claims the trial court was unaware it had any discretion to order such an evidentiary hearing—after Juror No. 4 refused to consent to the release of her personal identifying information.

First, we disagree that the trial court mistakenly believed it had no discretion to hold an evidentiary hearing in order to determine whether any juror misconduct occurred. (Cf. *People v. Tuggles, supra,* 179 Cal.App.4th at pp. 387-388 [trial court's mistaken understanding that it had no discretion to subpoena jurors—who refused to consent to the release of their personal identifying information—was error but harmless beyond a reasonable doubt].) The record unequivocally shows the trial court was aware it was not required to conduct an evidentiary hearing unless it was presented with a prima facie showing that *serious prejudicial misconduct* had occurred. (*People v. Hedgecock, supra,* 51 Cal.3d at p. 419.) The court made it clear that no such prima facie showing had been made based solely on Juror No. 4's letter. The court also expressly agreed with defense counsel's statement that it would not be "appropriate for the Court to conduct a hearing on whether or not misconduct occurred," given that the defense had not set forth "a sufficient basis for the Court to proceed in that fashion . . . ."**8**

---

**8** Some courts have observed that "'[w]hen a trial court is aware of *possible* juror misconduct, the court "must 'make whatever inquiry is reasonably necessary'"" to resolve the matter.' [Citation.]" (See, e.g., *Juror Number One v. Superior Court* (2012) 206 Cal.App.4th 854, 866.) Defendant interprets the statement to mean a trial court must conduct an evidentiary hearing whenever there is an indication of "possible juror misconduct," but this is not the law. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1255 ["the court 'must "make whatever inquiry is reasonably necessary"' . . . only when the

*[footnote continued on next page]*

Juror No. 4's posttrial letter to the court did not indicate a "strong possibility" of prejudicial juror misconduct, either alone or in view of the entire record. (*People v. Hedgecock, supra,* 51 Cal.3d at p. 419.) On the third day of deliberations, Juror No. 2 complained to the court that Juror No. 4 was "verbally attacking" her and asked to be released from jury duty. Still, Juror No. 2 agreed that she and Juror No. 4 were participating in the deliberations and that she could continue to participate if all the jurors were admonished to be civil and to listen to one another. After the trial court admonished all of the jurors and the verdicts were returned, Juror No. 4 wrote her letter to the court, referencing Juror No. 2's complaint "about who was causing problems during deliberations" and complaining that jurors were "verbally attacking" *her*, Juror No. 4. The apparent verbal spat between Juror Nos. 2 and 4 did not amount to a showing of any juror misconduct, let alone serious prejudicial misconduct.

Juror No. 4 also complained that other jurors had "already made up their minds" and did not want to be "bother[ed] with discussion." But in the context of the entire record, Juror No. 4's letter was, as the trial court put it, a "fly on the wall kind of a

---

*[footnote continued from previous page]*
defense comes forward with evidence that demonstrates a 'strong possibility' of prejudicial [juror] misconduct."].)

The statement originated in *People v. Burgener* (1986) 41 Cal.3d 505 at page 520, where it was applied in reference to the court's duty, during an ongoing jury trial, to make reasonable inquiry in order determine whether a juror should be discharged. The court there stated: "[O]nce the court is put on notice of the possibility a juror is subject to improper influences *it is the court's duty to make whatever inquiry is reasonably necessary to determine if the juror should be discharged* and failure to make this inquiry must be regarded as error. [Citation.]" (*Id*. at p. 520, italics added.) This illustrates the danger of quoting a statement of law out of the context in which it was originally applied.

representation . . . of what the process was like for [Juror No. 4] and her discomfort with it . . . ." Based on the entire record, there was no showing of any serious or prejudicial misconduct sufficient to warrant an evidentiary hearing.[9]

It is apparent that an evidentiary hearing would not have shed any additional light on Juror No. 4's complaints. As discussed, Juror No. 4's complaints did not amount to a prima facie showing of juror misconduct, and the trial court was under no obligation to conduct a "'fishing expedition'" to determine whether Juror No. 4 had anything further to say that might have supported a defense new trial motion based on juror misconduct. (*People v. Hedgecock, supra,* 51 Cal.3d at p. 419.) In her telephone message to the court, Juror No. 4 said she had nothing further to add to her letter. There was no reason to infer

---

[9] "A juror who expresses a fixed conclusion at the start of deliberations and rebuffs attempts to engage him or her in the discussion of other points of view raised by other jurors has refused to deliberate, and properly may be discharged." (See *People v. Alexander* (2010) 49 Cal.4th 846, 926; see also *Clemens v. Regents of University of California* (1971) 20 Cal.App.3d 356, 361 [juror who "prejudge[s] the case" by forming an opinion before all of the evidence has been admitted commits "serious misconduct"]; *People v. Brown* (1976) 61 Cal.App.3d 476, 480 [same].)

"On the other hand, '[t]he circumstances that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge.'" (*People v. Alexander, supra,* 49 Cal.4th at p. 926, quoting *People v. Cleveland* (2001) 25 Cal.4th 466, 485.)

Based on the entire record, Juror No. 4's letter did not seriously indicate that any jurors prejudged the case from the start of the deliberations or refused to deliberate. To the contrary, it appears there was a spirited discussion in the jury room, with Juror Nos. 2 and 4 "verbally attacking" each other's views of the evidence.

48

that Juror No. 4 had anything further to say that would have raised a reasonable inference that any juror misconduct occurred.

As the California Supreme Court has explained, "it is within the discretion of a trial court to conduct an evidentiary hearing to determine *the truth or falsity* of allegations of jury misconduct, and to permit the parties to call jurors to testify at such a hearing. This does not mean, however, that a trial court must hold an evidentiary hearing in every instance of alleged jury misconduct. The hearing should not be used as a 'fishing expedition' to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing." (*People v. Hedgecock, supra,* 51 Cal.3d at p. 419, fn. omitted, italics added.) Here, there was no conflict in the evidence that needed to be resolved by way of an evidentiary hearing. On their face, Juror No. 4's complaints did not amount to a "strong possibility" of juror misconduct. (*Ibid.*)

G. *Resentencing on the Attempted Murder Convictions (Counts 2, 3, 4, & 5)*

The court imposed *consecutive* terms of 30 years to life on each of defendant's four attempted murder convictions in counts 2 through 5.[10] In imposing the sentences,

---

[10] The 30-year-to-life terms were calculated as follows: life with the possibility of parole based on the premeditation findings (Pen. Code, § 664, subd. (a)); a 15-year minimum parole eligibility period based on the gang enhancements on each count (Pen. Code, § 186.22, subd. (b)(5)); doubled to 30 years based on defendant's prior strike conviction (Pen. Code, § 667, subd. (e)(1)).

49

the court observed that each 30-year-to-life term "*must, by matter of law, be imposed consecutively to the time that is imposed in Counts 1 and consecutively to one another . . . .*" (Italics added.)  Defendant claims the matter must be remanded for resentencing because the trial court had discretion to impose concurrent terms on counts 2 through 5, and the record affirmatively shows the court was unaware of its discretion.  We agree.

Under the Three Strikes law, a trial court may impose concurrent or consecutive terms on current serious or violent felony convictions committed on the same occasion or arising from the same set of operative facts.  (Pen. Code, § 667, subd. (c)(6), (7); *People v. Hendrix* (1997) 16 Cal.4th 508, 512-513.)  Without question, the murder of Sweat and the attempted murders of the four other victims occurred on the same occasion, within the meaning of the Three Strikes law.  (*People v. Lawrence* (2000) 24 Cal.4th 219, 225-227 [crimes brief in duration and committed "essentially simultaneously" against the same group of victims are committed on the same occasion]; *People v. Deloza* (1998) 18 Cal.4th 585, 595-596 ["same occasion" refers to "at least . . . a close temporal and spatial proximity between the acts underlying the convictions."].)

When the record *affirmatively* shows—as it does here—that the court mistakenly believed it was required to impose consecutive terms and had no discretion to impose concurrent terms, remand is necessary so the court may "impose sentence with full awareness of its discretion."  (*People v. Fuhrman* (1997) 16 Cal.4th 930, 944; *People v. Deloza, supra,* 18 Cal.4th at pp. 599-600.)  The matter must therefore be remanded for

50

resentencing so the trial court may exercise its discretion to impose concurrent *or*

consecutive terms on counts 2 through 5.[11]

H.  *Amendments to the Abstract of Judgment*

Defendant claims and we agree defendant's abstract of judgment must be amended

in two respects.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [court has inherent

authority to correct clerical errors in its records].)

The first of the two amendments concerns the $11,085 victim restitution order.

(Pen. Code, § 1202.4, subd. (f).)  At sentencing, defendant was ordered to pay $11,085 in

restitution to the Victim's Compensation Government Claims Board for expenses it paid,

namely, "burial costs and various programs associated with [Sweat] . . . ."  The abstract

of judgment mistakenly indicates that the $11,085 sum is to be paid to the "victim(s)."

The People agree that the abstract must be amended to reflect that the restitution amount

shall be paid to the Victim's Compensation Government Claims Board in conformity

with the oral pronouncement of judgment.  (*People v. Mesa* (1975) 14 Cal.3d 466, 471.)

The second amendment concerns a $10,000 parole revocation fine (Pen. Code,

§ 1202.45) on page 2 of the abstract.  The trial court did not impose a parole revocation

fine, and even if had, the fine would be unlawful because defendant's sentence does not

include the possibility of parole (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178,

---

[11]  The People argue that Penal Code section 186.22, subdivision (b)(5) required the court to impose consecutive terms on counts 2 through 5.  Not so.  Nothing in Penal Code section 186.22 requires a consecutive term to be imposed on any felony for which a gang enhancement allegation is found true, and the People cite no authority to support their argument.

1183-1185) or a determinate term (*People v. Battle* (2011) 198 Cal.App.4th 50, 63; cf. *People v. Brasure* (2008) 42 Cal.4th 1037, 1075 [parole revocation fine properly imposed on determinate term]).  The abstract must be amended to strike the parole revocation fine.

## IV.  DISPOSITION

The matter is remanded to the trial court with directions to exercise its discretion to impose either concurrent or consecutive terms on defendant's premeditated attempted murder convictions in counts 2 through 5.  The court is directed to amend defendant's abstract of judgment to (1) strike the $10,000 parole revocation fine and (2) clarify that the $11,085 victim restitution fine is payable to the Victim's Compensation Government Claims Board, not to the "victim(s)."  Following resentencing, the court is further directed to send an updated, corrected copy of the abstract of judgment to the Department of Corrections and Rehabilitation.  The judgment is affirmed in all other respects.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING

J.

We concur:

McKINSTER

Acting P. J.

RICHLI

J.

52